IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:19-CV-58

| | |
|---|---|
| SETH NORCROSS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **COMPLAINT** |
| v. ) | **(Jury Trial Demanded)** |
| ) | |
| 3M COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

PLAINTIFF SETH NORCROSS ("Plaintiff"), by and through the undersigned counsel,
brings this Complaint seeking judgment against Defendant 3M COMPANY; (hereinafter
"Defendant," "3M," or "3M/Aearo") for personal injuries incurred while on active military duty,
resulting from Defendant's defective and unreasonably dangerous product, the dual-ended
Combat Arms™ earplugs (Version 2 CAEv.2) ("Combat Arms Earplugs"). At all times relevant
to this action, Defendant manufactured, designed, formulated, tested, packaged, labeled,
produced, created, made, constructed, assembled, marketed, advertised, promoted, distributed,
and sold the Combat Arms Earplugs.

## I.    INTRODUCTION

1.    Plaintiff, a veteran of the United States Marine Corps, brings this action to
recover damages arising from personal injuries sustained while in on active military duty,
including both service domestically and deployment abroad. Plaintiff used Defendant's

dangerously defective Combat Arms Earplugs during training and combat exercises and during actual combat situations.

2.     Defendant sold the Combat Arms Earplugs to the U.S. military for more than a decade without the military or Plaintiff having any knowledge of the defect(s) and failed to adequately warn the military and/or Plaintiff of the defect(s). Defendant's Combat Arms Earplugs were standard issue in certain branches of the military (including Plaintiff's) beginning during or before 2003 and continuing at least into 2015. Thus, Defendant's Combat Arms Earplugs have probably caused tens of thousands of soldiers to suffer significant hearing issues, including hearing loss, tinnitus, and additional injuries related to hearing issues, including but not limited to physical pain, mental suffering and loss of enjoyment of life.

## II.     PARTIES, JURISDICTION, AND VENUE

3.     Plaintiff is a citizen and resident of Raleigh, Wake County, North Carolina.

4.     Defendant is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in St. Paul, Minnesota. Defendant is in the business of designing, manufacturing, and selling worker-safety products, including hearing protectors and respirators. Defendant has a dominant market share in virtually every safety-product market, including hearing protection. Defendant is among the largest 100 largest companies in the United States in terms of annual revenue, with $31.7 billion in 2017.

5.     The Court has subject matter jurisdiction pursuant 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and Plaintiff is not a resident of the same state as Defendant.

6.     The Court may exercise personal jurisdiction over Defendant, because Defendant has done business in the State of North Carolina, has committed the torts described herein either

2

at least partially in the State of North Carolina, has substantial and continuing contact with the State of North Carolina, and derives substantial revenue from goods used and consumed within the State of North Carolina. Defendant has provided its products, including the defective earplugs at issue, to tens of thousands of military members who serve on the numerous military bases located within North Carolina's borders.

7.      Plaintiff's claims arise out of Defendant's intentional and purposeful contacts with North Carolina. Plaintiff obtained and wore the defective earplugs at issue while firing weapons during training and combat exercises at Camp Lejeune in Onslow County, North Carolina.

8.      Venue in this Court is proper under 28 U.S.C. § 1391(b)(2), because substantial events and omissions giving rise to this action occurred in this District.

## III.    **FACTUAL ALLEGATIONS**

9.      Based on information and belief, and in part upon the allegations as contained in *United States ex rel. Moldex-Metric, Inc. v. 3M Company*,[1] Plaintiff alleges as follows:

10.     On July 26, 2018, Defendant agreed to pay $9.1 million to resolve allegations that it knowingly sold the Combat Arms Earplugs to the United States military without disclosing defects that hampered the effectiveness of the hearing protection device.[2]

11.     Defendant's Combat Arms Earplugs feature non-linear, selective attenuation; that is, they were designed to provide soldiers with two different options for aural attenuation depending upon how they are worn. Each side of the dual-sided earplugs purportedly provided adequate protection for the soldier's ears when worn.

---

[1] Case No. 3:16-cv-1533-DCC (D.S.C. 2016).
[2] *See* UNITED STATES DEP'T JUST., 3M COMPANY AGREES TO PAY $9.1 MILLION TO RESOLVE ALLEGATIONS THAT IT SUPPLIED THE UNITED STATES WITH DEFECTIVE DUAL-ENDED COMBAT ARMS EARPLUGS (Jul. 26, 2018), https://www.justice.gov/opa/pr/3m-company-agrees-pay-91-million-resolve-allegations-it-supplied-united-states-defective-dual [https://perma.cc/9EX9-UA6K] (last viewed Feb. 11, 2019).

3

12.     If worn in the "closed" or "blocked" position, with the olive-colored end inserted into the user's ear, the earplugs are intended to act as a traditional earplug and block as much sound as possible.



13.     If worn in the "open" or "unblocked" position, with the yellow side in the user's ear, the earplugs are intended reduce loud impulse sounds, such as battlefield explosions and artillery fire, while allowing the user to hear quieter noises; for example, commands spoken by fellow soldiers and approaching enemy combatants.

14.     Defendant's standard fitting instructions state that the wearer is to grasp the Combat Arms Earplug by the stem and insert the Combat Arms Earplug into the ear canal.

15.     The Combat Arms Earplug's design prevents a snug fit in the wearer's ear canal, an inherent defect about which there was no adequate warning.

16.     When inserted according to Defendant's standard fitting instructions, the edge of the third flange of the non-inserted end of the Combat Arms Earplug presses against the wearers' ear canal and folds back to its original shape, thereby loosening the seal in the ear canals and providing inadequate protection.

17.     Because the earplugs are symmetrical, following the standard fitting instructions results in a loosening of the seal regardless of which end is inserted into the ear canal.

18.     These earplugs were originally created by Aearo Technologies, LLC ("Aearo" or "3M/Aearo").

4

19.     Defendant 3M acquired Aearo on or around April 1, 2008, for $1.2 billion. The acquisition included Aearo's liabilities, and 3M is thus liable for Aearo's conduct as alleged herein.

20.     Earplugs like the Combat Arms Earplugs are sold with a stated Noise Reduction Rating ("NRR")[3] that should accurately reflect the efficacy of hearing protection. In other words, the NRR should represent the degree of sound attenuation experienced by a test group under conditions specified by the federal Noise Control Act, 42 U.S.C. § 4901, *et seq.*, and regulations promulgated thereunder.

21.     The military probably purchased at least one pair of 3M's Combat Arms Earplugs for each deployed soldier annually involved in certain foreign engagements beginning as early as 2003 and continuing at least into 2015.[4]

22.     3M's/Aearo's Combat Arms Earplugs were sold to the military beginning during or before late 2003 and continued to be sold directly and indirectly by 3M to the military until at least late 2015, when Defendant discontinued the earplugs.

23.     The defective earplugs have not been recalled and therefore could very well be in continued use by soldiers and others.

**January 2000 Testing**

24.     Employees from 3M/Aearo began testing the Combat Arms Earplugs in approximately January 2000.

---

[3] NRR is a unit of measurement used to determine the effectiveness of hearing protection devices to decrease sound exposure within a given working environment. Classified by their potential to reduce noise in decibels (dB), a term used to categorize the power or density of sound, hearing protectors must be tested and approved by the American National Standards ("ANSI") in accordance with the U.S. Occupational Safety & Health Administration ("OSHA"). The higher the NRR number associated with a hearing protector, the greater the potential for noise reduction.
[4] *See* D. Scott McIlwain *et al.*, *Heritage of Army Audiology and the Road Ahead: The Army Hearing Program*, 98 AM. J. PUB. HEALTH 2167–72 (Dec. 2008).

5

25.     3M/Aearo chose to conduct the testing at its own laboratory rather than through an outside, independent laboratory.

26.     3M/Aearo's employees personally selected ten test subjects, some of whom were also employees of 3M/Aearo, to test the Combat Arms Earplugs.

27.     3M/Aearo's employees intended to test: (1) the subject's hearing without an earplug inserted; (2) the subject's hearing with the open/unblocked (yellow) end of the Combat Arms Earplug inserted; and (3) the subject's hearing with the closed/blocked (olive-colored) end of the Combat Arms Earplug inserted. This testing was designed to provide data on the Combat Arms Earplugs' NRR.

28.     3M/Aearo personnel monitored the results of each subject as the test was performed and could thus stop the test if the desired NRR results were not achieved.

29.     Eight of the ten subjects were tested using both the open and closed end of the Combat Arms Earplug.

30.     Testing of the eight subjects suggested an average NRR of 10.9, which was far below the adequate NRR that 3M/Aearo personnel would and should have expected for the closed end.

31.     3M/Aearo prematurely terminated the January 2000 testing of the closed end of the Combat Arms Earplug.

32.     3M/Aearo personnel determined that when the closed, olive-colored end of the earplug was inserted into the wearer's ear according to standard fitting instructions, the basal edge of the third flange of the open, yellow end would press against the wearer's ear and fold backwards. When the inward pressure on the earplug was released, the yellow side flanges would

return to their original shape and cause the earplug to loosen. The wearer was not typically able to perceive this loosening.

33.  The earplug's symmetrical nature prevents a snug fit when worn either "open" or "closed" according to the standard fitting instructions.

34.  3M/Aearo personnel determined that a snug fit requires the flanges on the opposite, non-inserted end of the ear plug to be folded back prior to insertion.

35.  3M/Aearo personnel decided not to test the closed end of the Combat Arms Earplug for two of the ten subjects because the results were well below the intended and desired NRR.

36.  3M/Aearo completed testing of all ten subjects with the open end of the Combat Arms Earplug to obtain a facially invalid -2 NRR, which would indicate that the closed end of the earplug actually amplified sound.

37.  3M/Aearo represented the -2 NRR as a "0" NRR which 3M/Aearo has displayed on its packaging since its launch.

38.  3M/Aearo falsely touted the "0" NRR as a benefit of the Combat Arms Earplug, by suggesting that soldiers will be able to hear their fellow soldiers and enemies while still providing some protection. As stated however, the true "-2" NRR actually amplifies sound. In other words, it exposes the user to enhanced harm.

**February 2000 Testing**

39.  Upon identifying the fit issue, 3M/Aearo re-tested the olive, closed end of the Combat Arms Earplug in February 2000 using different fitting instructions.

40.  When testing the closed end, 3M/Aearo personnel folded back the yellow flanges on the open end of the Combat Arms™ earplug prior to insertion.

7

41. Using this modified fitting procedure, 3M/Aearo achieved a "22" NRR on the closed end of the Combat Arms™ earplug.

42. However, 3M never properly warned servicemen and -women that the only potential way to achieve this purported NRR was to modify the Combat Arms Earplug by folding the yellow flanges on the opposite end.

43. The yellow, open end of the Combat Arms Earplug was not re-tested using the "modified" fitting procedure.

**Defendant's Misrepresentations and Omissions**

44. Since 2003, 3M/Aearo has been awarded multiple Indefinite-Quantity Contracts ("IQC") from the U.S. military in response to Requests for Proposals ("RFPs").

45. From 2003 to 2012, 3M/Aearo was the United States Armed Forces' exclusive supplier of this type of earplug.

46. 3M/Aearo was aware of the design defects alleged herein in as early as 2000.

47. In other words, Combat Arms Earplugs' defects were known to Defendant many years before 3M/Aearo became the military's exclusive provider of the earplugs.

48. 3M/Aearo knew when it bid for the initial IQC that the Combat Arms Earplugs had dangerous design defects as they would not adequately protect the users from loud sounds and did not adequately warn of the defects or adequately warn how to wear the earplugs.

49. 3M/Aearo responded to the military's Requests for Proposal ("RFP") with express certifications that it complied with the Salient Characteristics of Medical Procurement Item Description ("MPID") of Solicitation No. SP0200-06-R-4202.

50. 3M/Aearo knew at the time it made its certifications that the earplugs did not comply with the MPID.

8

51.     3M/Aearo knew the design defects could cause the earplugs to loosen in the wearer's ear, imperceptibly to the wearer and even trained audiologists visually observing a wearer, thereby permitting damaging sounds to enter the ear canal by traveling around the outside of the earplug, while the user and/or audiologist incorrectly believes that the earplug is working as intended.

52.     The pertinent Salient Characteristics set forth in the MPID, which were uniform across all RFPs, in relevant part, are as follows:

> 2.1.1 Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield….
>
> 2.2.2. The sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19….
>
> 2.4     Workmanship. *The ear plugs shall be free from all defects that detract from their appearance or impair their serviceability.*
>
> 2.5     Instructions. *Illustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit.*[5]

53.     Pursuant to the Noise Control Act, the Environmental Protection Agency ("EPA") has promulgated regulations that govern the testing and attendant labeling of hearing protective devices like the Combat Arms Earplugs:

> The value of sound attenuation to be used in the calculation of the Noise Reduction Rating must be determined according to the "Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs." This standard is approved as the American National Standards Institute Standard (ANSI STD) S3.19-1974.[6]

---

[5] Solicitation No. SP0200-06-R-4202 at 41–42 (emphases added).
[6] 40 C.F.R. § 211.206-1(a).

9

54.     Additionally, EPA regulations require that certain "supporting information" accompany hearing-protection devices sold in the United States:

> The following minimum supporting information must accompany the device in a manner that insures its availability to the prospective user. In the case of bulk packaging and dispensing, such supporting information must be affixed to the bulk container or dispenser in the same manner as the label, and in a readily visible location: … *[i]nstructions as to the proper insertion or placement of the device.*[7]

55.     Additionally, the U.S. military's purchases of earplugs must meet the testing standards established by the U.S. Army Public Health Command, Army Hearing Program, or equivalent standards that may be established by other branches of the military. Any such standards are tied to the NRR achieved under the EPA regulations.

56.     3M/Aearo knowingly used the deliberately flawed retest of the closed end of the earplugs to sell Combat Arms Earplugs to the military with the representation that they possess a "22" NRR in the "closed" position.

*57.*     Defendant includes standard instructions for "proper use" of the earplugs in the packaging for the earplugs as required by the EPA, Noise Control Act, and the MPID.

58.     Defendant's standard instructions for "proper use" of its Combat Arms Earplugs do not instruct wearers to fold back the flanges of the opposite end before inserting the plug ear.

59.     Instead, Defendant improperly instructs wearers simply to insert the earplugs into the ear canal.

60.     By failing to instruct wearers of the Combat Arms Earplug to fold back the flanges on the open/unblocked end of the plug before inserting the closed/blocked end of the

---

[7] 40 C.F.R. § 211.204-4(e) (emphasis added).

plug into their ears (which is necessary to achieve the "22" NRR), 3M/Aearo falsely overstates the amount of hearing protection provided by the closed end of the plug.

61.     3M's/Aearo's packaging and marketing of such earplugs with a labeled NRR of "22" thereby misleads the wearer and has probably caused tens of thousands of soldiers to suffer significant hearing loss and tinnitus in addition to exposing millions more to the risk caused by 3M/Aearo's defective earplugs.

62.     Despite knowing that its flawed testing involved steps to manipulate the fit of the earplug, 3M's/Aearo's standard instructions for use of the earplugs do not instruct, and never have instructed, the wearer to fold back the flanges on the open end of the plug before inserting the closed end of the plug into their ears (which is necessary to achieve the "22" NRR and avoid the defect associated with the short stem).

63.     3M's/Aearo's instructions instead have provided standard fitting instructions for inserting the earplug on both ends which are facially inadequate.

64.     3M/Aearo was aware prior to selling the earplugs to the military, testing procedures and fitting instructions were unlawfully manipulated to obtain the NRRs it wanted on both ends of the Combat Arms Earplug, and 3M/Aearo continued to use these inaccurate NRRs to market the earplugs to the military for more than ten years without disclosing the design defect in the plugs.

65.     Plaintiff reserves the right to supplement these facts after discovery.

### Plaintiff's Experience with
### Combat Arms Earplugs

66.     Plaintiff joined the Marines on his eighteenth birthday, in March 2006, and was discharged in March 2011.

67.     Before joining the Marines, Plaintiff had no signs or symptoms of hearing issues or tinnitus.

68.     Plaintiff's duty stations included Camp Allen in Norfolk, Virginia; and Guantanamo Bay, Cuba. Plaintiff was deployed to Baghdad, Iraq, from approximately March 2008 until approximately October 2008. Plaintiff was then stationed at Camp Lejeune until March 2011.

69.     The 3M Combat Arms Earplugs were standard issue in the Marines throughout the duration of Plaintiff's military service.

70.     The Marine Corps provided multiple pairs of the Combat Arms Earplugs to Plaintiff during the course of his service.

71.     Plaintiff wore the Combat Arms Earplugs while conducting training and combat exercises in Baghdad, and at Camp Lejeune, starting in 2007.

72.     Specifically, Plaintiff wore the Combat Arms Earplugs while training at rifle ranges at the Marines' School of Infantry, while firing small arms during close-quarters exercises such as house-clearing, while exposed to indirect explosions in Baghdad, and while training around explosives.

73.     Plaintiff was never instructed to fold back the flanges on the opposite side of use of the earplug.

74.     Plaintiff began to notice symptoms of tinnitus in late 2007. Plaintiff experiences tinnitus as near-constant ringing in his left ear that often distracts from his work at a paper-shredding company and from his daily activities. Plaintiff has less-pronounced symptoms in his right ear.

75.     Plaintiff was first diagnosed with tinnitus in early 2011 as he was preparing to separate from the Marine Corps.

76.     Plaintiff has also experienced hearing loss in both ears, especially his left ear. This loss has been noted in annual medical examinations since Plaintiff left the Marine Corps.

## IV.     CAUSES OF ACTION

### Count I
### Design Defect – Negligence

77.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

78.     At all times relevant to this action, Defendant had a duty to manufacture, design, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, and distribute, the Combat Arms with reasonable and due care for the safety and well-being of U.S. military servicemen and -women, including Plaintiff, who were subject to and used the Combat Arms Earplugs during their service with the U.S. military.

79.     Plaintiff was a foreseeable user of the Combat Arms Earplugs and Defendant knew that the Combat Arms Earplugs would be used by U.S. military servicemen and -women, including Plaintiff.

80.     The Combat Arms Earplugs are defective in that the design of the earplug causes them to loosen in the wearer's ear, imperceptibly to the wearer, thereby permitting damaging sounds to enter the ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

81.     In other words, a proper seal is not formed with the ear canal when the Combat Arms Earplug is inserted into the ear according to standard fitting instructions.

13

82.    The defect has the same effect when either end is inserted because the earplugs are symmetrical. In either scenario, the effect is that the earplug may not maintain a tight seal in some wearers' ear canals such that dangerous sounds can bypass the plug altogether thereby posing serious risk to the wearer's hearing unbeknownst to him or her.

83.    Defendant failed to exercise reasonable and due care under the circumstances and therefore breached this duty in the following ways:

a.    Defendant failed to design the Combat Arms in a manner which would result in a NRR of "22" when used with the closed, olive end inserted, according to the standard fitting instructions provided by Defendant.

b.    Defendant failed to properly and thoroughly test the Combat Arms Earplugs;

c.    Defendant failed to properly and thoroughly analyze the data resulting from testing of the Combat Arms Earplugs;

d.    Defendant designed, manufactured, distributed, and sold the Combat Arms Earplugs without an adequate warning of the significant and dangerous risks of the earplugs;

e.    Defendant designed, manufactured, distributed, and sold the Combat Arms Earplugs without providing proper instructions to avoid the harm which could foreseeably occur because of using the earplugs in the manner the Defendant's standard fitting instructions directed;

f.    Defendant failed to fulfill the standard of care required of a reasonable and prudent manufacturer of hearing protection products, specifically including products such as the Combat Arms Earplugs; and

g.    Defendant negligently continued to manufacture and distribute the Combat Arms Earplugs (Version 2 CAEv.2) to the U.S. military after Defendant knew or should have known of its adverse effects and/or the availability of safer designs.

84.    Defendant knew or should have known that the defective condition of the Combat Arms Earplugs made it unreasonably dangerous to the U.S. military servicemen and -women who used the earplugs.

14

85.     The Combat Arms Earplugs were dangerous when used by ordinary U.S. military servicemen and -women who used it with the knowledge common to the U.S. military as to the product's characteristics and common usage.

86.     Defendant knew or should have known of the defective design at the time the Combat Arms Earplugs were used by Plaintiff.

87.     At the time the Combat Arms Earplugs were used by Plaintiff and left the possession of Defendant, the Combat Arms Earplugs were in a condition which made them unreasonably dangerous to the ordinary U.S. military service member.

88.     At all relevant times, Plaintiff used the Combat Arms Earplugs in the manner in which they were intended.

89.     As designer, developer, manufacturer, inspector, advertiser, distributor, and supplier of the Combat Arms Earplugs, Defendant had superior knowledge of the Combat Arms Earplugs and therefore owed a duty of care to Plaintiff.

90.     It was foreseeable that Defendant's actions, omissions, and misrepresentations would cause Plaintiff severe, permanent, and debilitating injuries.

91.     The Combat Arms Earplugs were a proximate cause of Plaintiff's personal injuries – specifically Plaintiff's hearing loss and tinnitus. Defendant's conduct was a substantial factor in bringing about the injuries sustained by Plaintiff because 3M designed, manufactured, tested, sold, and distributed the Combat Arms Earplugs to the U.S. military.

92.     As a direct and proximate result of Defendant's negligence in designing the defective Combat Arms Earplugs, Plaintiff was caused to suffer serious and dangerous side effects, including hearing loss and tinnitus, and has further suffered the other injuries and damages as alleged herein.

## Count II
## Failure to Warn – Negligence

93.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

94.     At all times relevant to this action, Defendant had a duty to manufacture, design, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, and distribute, the Combat Arms with reasonable and due care for the safety and well-being of U.S. military servicemen and -women, including Plaintiff, who were subject to and used the Combat Arms Earplugs during their service with the U.S. military.

95.     Plaintiff was a foreseeable user of the Combat Arms Earplugs.

96.     The Combat Arms Earplugs are defective, in part, in that the design of the earplug causes them to loosen in the wearer's ear, imperceptibly to the wearer, thereby permitting damaging sounds to enter the ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is functioning as intended.

97.     The Combat Arms Earplugs were not accompanied by warnings. In the alternative, they were accompanied by inadequate warnings and/or instructions, as to the risk that the Combat Arms Earplugs would allow for dangerous sounds to bypass the plug altogether thereby posing a serious risk to Plaintiff's hearing unbeknownst to him.

98.     The warnings and instructions that accompanied the Combat Arms Earplugs failed to provide that level of information that an ordinary consumer would expect when using the Combat Arms Earplugs in a manner reasonably foreseeable to Defendant.

99.     Had Plaintiff received a proper or adequate warning as to the risks associated with the Combat Arms Earplugs, he would not have used the Combat Arms Earplugs.

16

100.     For all these reasons and others, the danger created by the Combat Arms Earplugs was neither open nor obvious to Plaintiff nor to any other reasonable user of the Combat Arms Earplugs.

101.     The Combat Arms Earplugs' defects were a proximate cause of Plaintiff's hearing issues and tinnitus because design of the earplugs allows for dangerous sounds to bypass the plug altogether thereby posing a serious risk to Plaintiff's hearing unbeknownst to him.

102.     As a direct and proximate result of Defendant's failure to warn, Plaintiff was caused to suffer serious and dangerous side effects, including hearing loss and tinnitus, and has further suffered the injuries and damages as alleged herein.

**Count III**
**Breach of Express Warranty**
**N.C.G.S. § 25-2-313**

103.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

104.     Through Defendant's public statements, descriptions of the Combat Arms Earplugs, and promises relating to the Combat Arms Earplugs, Defendant expressly warranted, *inter alia*, that the Combat Arms Earplugs were safe and effective for their intended use, and were designed and constructed to prevent harmful sounds from bypassing the earplugs, *i.e.*, to protect the user's hearing.

105.     These warranties were made to Plaintiff in one or more of the following forms: (i) publicly made written and verbal assurances of safety; (ii) press releases and dissemination via the media, or uniform promotional information that were intended to create a demand for the Combat Arms Earplugs but contained material misrepresentations and failed to warn of the risks of the Combat Arms Earplugs; (iii) verbal assurances made by Defendant's consumer-relations

17

personnel about the safety of the Combat Arms Earplugs, which also downplayed the risks associated with the Combat Arms Earplugs; and, (iv) false and misleading written information and packaging supplied by Defendant.

106. When Defendant made these express warranties, it knew the purpose(s) for which the Combat Arms Earplugs were to be used and warranted the earplugs to be in all respects safe and proper for such purpose(s).

107. Defendant drafted the documents and/or made statements upon which these warranty claims are based and, in doing so, defined the terms of those warranties.

108. The Combat Arms Earplugs do not conform to Defendant's promises, descriptions, or affirmation of fact, and were not adequately packaged, labeled, promoted, and/or fit for the ordinary purposes for which such earplugs are used.

109. Plaintiff further alleges that all of the aforementioned written materials are known to Defendant and in its possession, and it is Plaintiff s reasonable belief that these materials will be produced by Defendant and become part of the record once Plaintiff is afforded the opportunity to conduct discovery.

110. As a direct and proximate result of Defendant's breach of the express warranties, Plaintiff suffered and continues to suffer serious and dangerous side effects, including hearing loss and tinnitus, and has further suffered the injuries and damages as alleged herein.

**<u>Count IV</u>**
**Breach of Implied Warranty**
**N.C.G.S. § 25-2-314**

111. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

18

112.     At the time Defendant marketed, sold, and distributed the Combat Arms Earplugs, Defendant knew of the use for which the Combat Arms Earplugs were intended and impliedly warranted the Combat Arms Earplugs to be fit for a particular purpose and warranted that the Combat Arms Earplugs were of merchantable quality and effective for such use.

113.     Defendant knew, or had reason to know, that Plaintiff would rely on Defendant's judgment and skill in providing the Combat Arms Earplugs for their intended use.

114.     Plaintiff reasonably relied upon Defendant's skill and judgment as to whether the Combat Arms Earplugs were of merchantable quality, safe, and effective for their intended use.

115.     Contrary to such implied warranties, the Combat Arms Earplugs were neither of merchantable quality, nor safe or effective for the intended use, because the Combat Arms Earplugs were and are unreasonably dangerous, defective, unfit and ineffective for the ordinary purposes for which they earplugs were used.

116.     As a direct and proximate result of Defendant's breach of implied warranties, Plaintiff has suffered and continues to suffer serious and dangerous side effects, including hearing loss and tinnitus, and has further suffered the injuries and damages as alleged herein.

### Count V
### Fraudulent Misrepresentation

117.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

118.     Defendant falsely represented to Plaintiff that the Combat Arms Earplugs had been properly tested and were free from any defect that could damage Plaintiff's hearing.

19

119.    Defendant intentionally manipulated testing of the Combat Arms Earplugs, resulting in false and misleading NRRs and improper fitting instructions.

120.    Defendant's representations were false.

121.    When Defendant made these representations, it knew those representations to be false, or, alternatively, it made the representations with willful, wanton and reckless disregard for the representations' truth or falsity.

122.    These representations were made by Defendant with the intent of defrauding and deceiving Plaintiff and other potential buyers, and were made with the intent of inducing Plaintiff and others to recommend, purchase, and/or use the Combat Arms Earplugs, all of which reflect a callous, reckless, and willful indifference to Plaintiff's health, safety and welfare.

123.    At the time the aforesaid representations were made by Defendant and, at the times Plaintiff used the Combat Arms Earplugs, Plaintiff was unaware of the falsity of said representations and reasonably believed them to be true.

124.    In reliance upon these representations, Plaintiff was induced to and did use Combat Arms Earplugs, thereby sustaining severe and permanent personal injuries, including hearing loss and tinnitus.

125.    Said Defendant knew or should have known that the Combat Arms Earplugs had not been sufficiently tested, were defective in nature, and/or that they lacked proper instructions.

126.    Defendant knew or should have known that the Combat Arms Earplugs had a potential to, could, and would cause severe and grievous injury to the users of said product.

127.    Defendant brought the Combat Arms Earplugs to the market, and acted fraudulently, wantonly and maliciously to the detriment of Plaintiff.

128.	As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, hearing loss and tinnitus, and has further suffered the injuries and damages as alleged herein.

## Count VI
### Fraudulent Concealment

129.	Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

130.	At all times relevant, Defendant misrepresented the safety and efficacy of the Combat Arms Earplugs for their intended use.

131.	Defendant knew or was reckless in not knowing its representations were false.

132.	In representations to Plaintiff, Defendant fraudulently concealed and intentionally omitted the following material information:

(a)	That testing of the Combat Arms Earplug was deliberately flawed;

(b)	The amount of hearing protection provided by the Combat Arms Earplug;

(c)	That Defendant was aware of the defects in the Combat Arms Earplug;

(d)	That the Combat Arms Earplug was defective, and would cause dangerous side effects, including but not limited to hearing damage or impairment;

(e)	That the Combat Arms Earplug was manufactured negligently;

(f)	That the Combat Arms Earplug was manufactured defectively;

(g)	That the Combat Arms Earplug was designed defectively;

(h)	That the Combat Arms Earplug was designed negligently;

(i)	That the Combat Arms Earplug was designed improperly.

133.	Defendant was under a duty to disclose to Plaintiff the dual-end Combat Arms Earplug's defective nature.

21

134.     Defendant had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used the dual-end Combat Arms Earplug, including Plaintiff, in particular.

135.     Defendant's concealment and omissions of material facts concerning, *inter alia*, the Combat Arms Earplug's safety and efficacy was made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiff into reliance, continued use of the dual-end Combat Arms™ earplug, and actions thereon, and to cause him to purchase and/or use the product. Defendant knew that Plaintiff had no way to determine the truth behind Defendant's concealment and omissions, and that these included material omissions of facts surrounding the Combat Arms Earplug, as set forth herein.

136.     Plaintiff reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendant.

137.     By reason of the foregoing, Plaintiff was caused to suffer serious and dangerous side effects including hearing loss and tinnitus, and has further suffered the injuries and damages as alleged herein.

### Count VII
### Negligent Misrepresentation

138.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

139.     Defendant had a duty to provide Plaintiff and other users of the Combat Arms Earplugs with accurate information – and only accurate information – about the extent to which the Combat Arms Earplug had been properly tested and found to be effective.

22

140.    Defendant was aware its testing procedures and fitting instructions were unlawfully manipulated.

141.    The representations made by Defendant were, in fact, false.

142.    Defendant failed to exercise ordinary care in its statements about the Combat Arms Earplug, while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution into interstate commerce, in that Defendant negligently misrepresented the Combat Arms Earplug's safety and efficacy.

143.    Defendant breached its duty in representing the Combat Arms Earplug's serious defects to Plaintiff.

144.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, hearing loss and tinnitus, and has further suffered the injuries and damages as alleged herein.

<u>**Count VIII**</u>
**Punitive Damages**

145.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

146.    Defendant has acted willfully, wantonly, and recklessly by:

a. Failing to disclose material facts regarding the dangerous and serious safety concerns of Combat Arms Earplug by concealing and suppressing material facts regarding the dangerous and serious health and/or safety concerns of Combat Arms Earplug;

b. Failing to disclose the truth and making false representations with the purpose and design of deceiving and lulling Plaintiff, and others, so that they would use and rely upon the Combat Arms Earplug; and/or

c. Falsely representing the dangerous and serious health and/or safety concerns of the Combat Arms Earplug to the public at large, and Plaintiff in particular.

147. Defendant's directors and officers participated in the tortious conduct at issue in this action.

## V. TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

148. Plaintiff filed this lawsuit within the applicable limitations period, as measured from when he first suspected that the Combat Arms Earplugs caused his injuries. Plaintiff could not have, by the exercise of reasonable diligence, discovered the cause of the Combat Arms Earplugs-induced injuries at an earlier time, because, at the time of these injuries, the cause was unknown to Plaintiff. Plaintiff did not suspect nor have reason to suspect the cause of these injuries or the tortious nature of the conduct causing these injuries until a later time that renders the filing of this action to be within the applicable limitations period.

149. Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Plaintiff had been exposed to the defects and risks alleged herein, and that those defects and risks proximately resulted from Defendant's acts and omissions.

150. Furthermore, even if Plaintiff had suspected that Defendant may have misrepresented or concealed material facts such as the NRR or details of the Combat Arms Earplugs' testing, Plaintiff relied on Defendant's continuous and responsive representations that the Combat Arms Earplugs were safe and did not otherwise have means to obtain knowledge as to the real facts at issue in this action.

151. In other words, in good-faith reliance on Defendant's misrepresentations and concealment, Plaintiff to his detriment refrained from filing a claim before the expiration of the statutes of limitations.

152.     Defendant knew that its statements were false and knew or reasonably expected that Plaintiff would rely on its misrepresentations and concealment in refraining from filing a claim before the expiration of any statutes of limitation.

153.     Plaintiff did not know that Defendant's representations were untrue when Defendant made them.

154.     Because of Defendant's above-described conduct, it would prejudice Plaintiff and be unjust to allow Defendant to deprive Plaintiff of the value of any of the below-stated causes of action based on a failure to file a claim before the expiration of any statutes of limitation.

155.     As a result of Defendant's actions, Defendant is equitably estopped from asserting any applicable statutes of limitations or similar time-related defenses, and such defenses are equitably tolled.

156.     Additionally, pursuant to the Servicemembers Civil Relief Act, 50 U.S.C. § 3936, the period of Plaintiff's military service may not be included in computing any applicable statutes of limitations.

## VI.     **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays as follows:

i.    For trial by jury on all issues so triable;

ii.   That judgment be in favor of Plaintiff and against Defendant for the damages set forth below, along with court costs, pre- judgment and post-judgment interest at the legal rate;

iii.  That Plaintiff be awarded damages for past and future pain and suffering;

iv.   That Plaintiff be awarded damages for lost wages, both past and future;

v.    That Plaintiff be awarded damages for loss of earning capacity;

25

vi. That Plaintiff be awarded damages for medical expenses, both past and future;

vii. That Plaintiff be awarded damages for loss of enjoyment of life, both past and future;

viii. That Plaintiff be awarded damages for mental anguish and distress, both past and future;

ix. That Plaintiff be awarded damages for disfigurement, both past and future;

x. That Plaintiff be awarded damages for physical impairment, both past and future;

xi. That Plaintiff be awarded reasonable attorney fees;

xii. That Plaintiff be awarded damages for punitive damages in amounts to be proven at trial; and

xiii. For all such other relief as to which Plaintiff may be entitled.


Respectfully submitted, this 19th day of March 2019.


**LAW OFFICES OF JAMES SCOTT FARRIN**
*Attorneys for Plaintiff*

By:     */s/ Christopher R. Bagley*
Gary W. Jackson (NC Bar No. 13976)
Hoyt G. Tessener (NC Bar No. 16068)
Christopher R. Bagley (NC Bar No. 50567)
Preston W. Lesley (NC Bar No. 52261)
280 S. Mangum Street, Suite 400
Durham, North Carolina 27701
Telephone: (800) 220-7321
Facsimile: (800) 716-7881
Email: cbagley@farrin.com

26